The People of the State of New York, Appellant, *v.* Alonzo Snyder, Respondent.

Courts will take judicial notice of whatever ought to be generally known within the limits of their jurisdiction. And, accordingly, the courts of this State will take judicial notice, that the western portion of the territory of this State was, by its own act, ceded to the State of Massachusetts, and, by the latter, conveyed to certain parties, who afterward, under the proper authority of both States and of the nation, extinguished the title of the Indians to it. (Daniels, J.)

Where a conveyance is acknowledged before an officer, authorized to take such acknowledgment within the limits of his jurisdiction, it will be presumed that such acknowledgment was actually taken within such limits.

A deed is presumed to have been delivered at the time of its date.

The provisions of the treaty of the United States with Great Britain, in 1794, with reference to the capacity of British aliens to hold and convey lands in this country under it; the law of this State, passed April 2d, 1798, upon the same subject and the applicability of such provisions and of that law to the Pulteney title in this State; stated and discussed by Daniels, J.

The validity of the titles, derived from conveyances by the British trustees of the Pulteney estate, affirmed.

*Duke of Cumberland* v. *Graves* (3 Seld., 305), approved and followed.

(Cause argued October 5th, 1869, and decided December 22d, 1869.)

Appeal from a judgment of the Supreme Court at General Term, in the seventh district, affirming a judgment for the defendant.

This action was brought to recover the possession of one hundred and ten acres of land, situated in the town of Spring-water in Livingston county, and for damages for wrongfully witholding it from the plaintiff. The defendant claimed possession under William, earl of Craven, Alexander Oswald and Edmund Bucknall Estcourt, who were alleged to own the premises as trustees in fee. At the trial of the action, before the Circuit Court held in Livingston county, a verdict was directed for the defendant. The plaintiff appealed from the judgment recovered on the verdict to the General Term in the seventh district, where the judgment was affirmed.

The opinion in that court is contained in the 51st of Barbour, 589. The plaintiff appealed from that judgment to this court.

The facts are stated in the opinions.

*Scott Lord,* for appellants.

*D. Rumsey,* for respondent.

DANIELS, J. A very great number of objections were taken by the plaintiff's counsel to the admission of evidence upon the trial of this cause, which have been fully argued in the brief presented to the court on the part of the appellant. But it will be entirely unnecessary to consider and dispose of them in detail, under the view which has been taken of the case. The title upon which the defendant relied for his defence is identical with that, in many respects, upon which the real property of nearly the entire western portion of this State depends. Its early history is a matter of general notoriety and interest throughout the State, and, in fact, of the United States; and, for that reason, the transactions and public documents on which it has so long rested should be judicially noticed by the courts without further proof of their authentication. The rule mentioned by Greenleaf on this subject, is stated to be, that "courts will generally take notice of whatever ought to be generally known within the limits of their jurisdiction." (1 Greenleaf on Evidence, § 6, p.10; *Smith* v. *N. Y. Central R. R. Co.,* 43 Barb., 225, 231; *Swinnerton* v. *Columbian Ins. Co.,* 37 N. Y., 174, 188–90.) And that is certainly broad enough to permit courts of justice, on the public history of the State, to know, that the western portion of its territory was, by its own act, ceded to the State of Massachusetts, and by the latter conveyed to certain parties, who afterward, under the proper authority of both States and of the nation, extinguished the title of the Indians to it. Under this rule, the formal objections taken to the documents offered and received for the purpose of establishing those facts became entirely unimportant as well as immaterial.

The same legal consequence follows from the form which was given to the pleadings in the cause. For, by the com-- plaint, it was alleged that Robert Morris, the grantee of Nathaniel Gorham and Oliver Phelps, to whom the State of Massachusetts conveyed the property, owned it in fee, on the 20th day of February, 1795. The answer in substance admits, that Morris did own the property in fee, without conced- ing that he was such owner at the precise time mentioned in the complaint. Upon the subject of his title, the answer pro- ceeds farther than the complaint, and alleges that he derived his title from Gorham and Phelps. As to the objections taken to the form, as well as those urged against the validity and substance of the preceding title to the land, the time when Morris became the owner was not material. It was sufficient to dispose of them, that he did acquire the fee of the land sometime after the year 1790, for he could only have done that legally by the cession of the State of New York and the conveyance of the State of Massachusetts, and the extinguishment of the Indian title being maintained. For the purpose of disposing of the case, therefore, it may be properly assumed that Robert Morris did become the owner of the fee of the land in controversy.

A similar answer is furnished by the state of the pleadings, to all the other objections made to the defendant's evidence concerning the legal title to the land in controversy. For they show, at least, a formal transmission of the title to the persons under whom the defendant occupied the land. Upon this subject, it is averred in the complaint, that Morris and wife, by an instrument duly signed and sealed by them, conveyed the premises to Charles Williamson, who lived and died a subject of the king of Great Britain; and that the defendant entered into and claimed title to them by or through the authority of Williamson or his grantees. These averments are more fully elaborated in the fourth subdivision of the complaint, by the statement that Williamson, in due form of law, conveyed the premises to Sir William Pulteney, who died afterward, leaving his only child, Henrietta Laura Pulteney,

his heir-at-law; and that she died, leaving Sir John Lowther Johnstone, her only heir-at-law, who, at the time of his death, left a last will and testament, "by which he devised his lands in America, to Ernest Augustus, called the duke of Cumberland, Charles Herbert Pierpont, David Cathcart, and Masterton Ure, in trust, for certain purposes," in his will mentioned. It is then alleged that such conveyances and releases were afterward made, under and in pursuance of that will; that Ernest Augustus, David Cathcart, Masterton Ure, and John Gordon, became and were seized of such lands, and held the title thereto in pursuance of the will, and subject to the trust provided for in it. And after that, by the decease of Ernest Augustus and David Cathcart, Masterton Ure and John Gordon were left the surviving trustees under the will, and as such, severally conveyed their interest in the premises, to William, earl of Craven, Alexander Oswald and Edmund Bucknall Estcourt, whom it is averred, thereupon and pursuant to the terms of such last will and testament of Sir John Lowther Johnstone, became seized of such lands and held the title thereto, subject to such trusts, and now hold the same. After alleging that all these persons were aliens and subjects of the king of Great Britain, it is stated that the defendant was in possession of the land in dispute, under the three persons last named.

The answer to the complaint is peculiar in its structure. It contains no general or specific denial whatever, but denies the allegations of the complaint, except as the same are afterward expressly admitted to be true, which it may be observed in passing, is a form of denial in no way provided for or sanctioned by the present system of pleading. The fifth subdivision of the answer then proceeds to show that the defendant was in possession of the land under the same persons from whom the complaint stated he had derived that possession. And their title is traced back to the State of Massachusetts, through the same persons, devise and conveyances more particularly mentioned and described in the complaint. The only difference in the pleadings being that

already referred to, the time when Charles Williamson
derived his title from Robert Morris. Thus it will be seen,
that no issue whatever was made concerning the transmission
of the formal title to the land, for both the plaintiff and
defendant agreed entirely in their statements upon that sub-
ject. Hence the documentary and formal evidence given to
establish it by the defendant, beyond the deeds from Robert
Morris and wife to Charles Williamson, and from him to Sir
William Pulteney, was not only wholly needless, but it was
actually impertinent and immaterial. And if the objections
taken to that evidence were otherwise well founded, they
were, under the issue, of no legal importance whatsoever, for the
admission of the proof could by no possibility work any injury
to the plaintiff. The agreement of the pleadings upon this
part of the case was conclusive upon both the parties, and
neither could be prejudiced by evidence tending to show the
truth of the facts so agreed upon.

If this evidence had any possible pertinency to the issue in
the case, it was to that part of it which may perhaps have
been made upon the alienage of those persons through whom
the premises were transmitted from Williamson to the
defendant, for it did prove that they were aliens as the
complaint had stated them to be. So far, it may have bene-
fited the plaintiff's case, but that fails to render the objec-
tions any more tenable than they would have been, if that
issue had not been made.

The plain theory of the plaintiff's case, as the complaint
disclosed it, was, that Williamson received his conveyance
from Robert Morris on the 20th of February, 1795, and that
he was at that time an alien, and the persons afterward suc-
ceeding to the title were also aliens. For this reason it was
claimed that the title had vested by escheat in the plaintiff.
Upon this part of the case, the deed from Morris to William-
son was pertinent evidence. Formal proof of the execution
of that deed was rendered necessary by the pleadings, in
order to entitle the court to receive it as evidence, because
both the parties in their pleadings agreed that a deed convey-

ing the property had been made and delivered by Morris to Williamson. The only disagreement which existed was that concerning the time when it was done. The deed itself appears by the case to have been produced by the defendant upon the trial; and from the copy inserted in it, this deed seems to have been dated on the 11th day of April, 1792, to have been sealed and delivered in the presence of four subscribing witnesses, and acknowledged before James Wilson, one of the judges of the Supreme Court of the United States, on the 20th of February, 1795. This officer was entitled to take the acknowledgment, and it must be presumed that he did it within the limits of his jurisdiction, even though that is not stated to have been the case in the certificate which he made, for the legal presumption is in favor of the validity of the acts of public officers, where nothing appears warranting a different conclusion. This certificate of acknowledgment was sufficient proof of the execution of the deed to render it admissible as evidence upon the trial, particularly after so great a lapse of time, from which it might well be presumed, that the subscribing witnesses had all departed this life before the time when the trial was had.

No other evidence was given than that which the deed itself furnished, for the purpose of showing the time of its delivery; and under the state of the proof, the law presumes it to have been delivered at the time of its date. *Seymour* v. *Van Slyck* (8 Wend., 403, 414); Cowen & Hill's notes, 3d Ed., part 1, 461, part 2, 588, and cases cited; and *Duke of Cumberland* v. *Graves* (3 Seld., 305, 308), where that view was very properly taken in the application of the law to this deed, for the subsequent acknowledgment did not change that presumption. (*Ford* v. *Gregory*, 10 B. Monroe, 175, 180.) Assuming, as this court should under the evidence, that this deed was made and delivered at the time when it bears date, and not at the date of the acknowledgment, which, as a matter of convenience, may very well have been made afterward, then even if Williamson was at that time an alien, as he was stated to be in the complaint, he was enti-

tled under the treaty between the United States and Great Britain to hold and convey the title to the land. This treaty was made on the 19th of November, 1794; and by its ninth article it was agreed that British subjects who then held lands in the territories of the United States, should continue to hold them according to the nature and tenure of their respective estates and titles therein, and that they might grant, sell or devise the same to whom they pleased, in like manner as if they were natives; and that neither they nor. their heirs or assigns should, so far as respected such lands and the legal remainders incident thereto, be regarded as aliens. (U. S. Statutes at Large, vol. 8, 122, act 9.) This clearly empowered Williamson to hold and convey the title to the land, even though the allegations of the complaint concerning his alienage were true, for by the constitution of the United States, it became a part of the supreme law of the land, and as such obligatory upon the authorities of the different States. (1 R. S., Edmonds' ed., 23; Art. 6, § 2 of Const. of U. S.)

But evidence was given from the records of the Supreme Court of Pennsylvania, showing very satisfactorily that Williamson was naturalized in that court on the 9th day of January, 1792, a few months before the date of the deed from Morris and wife to him. This was certified by the clerk of the court, and authenticated by the chief justice in the form required by the act of congress, in order to render it entitled to full faith and credit in the courts of this State, and for that reason, it was not only admissible as evidence, but beyond that it completely justified the court in excluding the mere certificate of the clerk that no other paper than the oath was found by him on file in his office. This was due to the record as evidence, for full faith and credit would not otherwise have been given to it. This record showed that Charles Williamson had been admitted as a citizen of the United States, and from the identity of the name in the absence of all other proof upon the subject, it is to be presumed that he was the same person to whom the conveyance

from Morris was made.   (*Hatcher* v. *Rocheleau*, 18 N.
Y., 86.)

But it is of no special importance in this case whether
Williamson was ever naturalized or not; for the treaty
authorized him to hold and convey the land, if he was an alien
British subject, and the laws of the State permitted him to
do the same, if he had become a citizen of the United States.
He could in either case convey the title to the land.

It appears by the date, as well as the certificate of acknow-
ledgment, of the deed from Williamson to Sir William Pul-
teney, that it was executed on the 31st day of March, 1801,
and by the certificate of its record, that it was recorded in the
office of the secretary of the State of New York, on the
21st of October, 1801, less than twelve months after the day
of its date.   It was a valid conveyance therefore, even though
made, as it appeared to have been, to an alien; for it was
made within the time in which, under the act of April 2,
1798, lands could be conveyed to aliens, not being the sub-
ject or subjects of some sovereign State or power at war with
the United States of America.   In order to render a convey-
ance to an alien valid under that act, all that was necessary
was that it should be made within three years after its pas-
sage, and be recorded in the office of the secretary of State
within twelve months after the day of its date.   (Edmonds'
ed. of General Statutes, vol. 4, 294.)   And a compliance
with both of those requirements was shown for the purpose
of sustaining this conveyance.   That statute provided that
conveyances, made and recorded under its provisions, should
be deemed valid to vest the estate thereby granted in the
alien grantees, and that it should be lawful for such alien or
aliens to hold the same to his, her or their heirs and assigns
forever, any plea of alienism to the contrary notwithstanding.
And this statute, together with the act affecting its construc-
tion, which was enacted in 1819 (Gen'l Statutes of N. Y., vol.
4, 295), have been held by this court to legalize and sanction
the title of the persons from whom the present claimants of
the property in question derived their estate. (*Duke of Cum-*

*berland* v. *Graves*, 3 Seld., 305.)   Under that authority, the fact of their being aliens, and of the title being conveyed and devised through aliens, was not sufficient to entitle the plaintiff to divest it as an escheated estate.

The same conclusion would also result from the article in the treaty of 1794, already referred to, if Williamson was at that time an alien ; for that provided that neither the alien owner, being a subject of the king of Great Britain, nor their heirs or assigns, should be regarded as aliens so far as such lands were concerned.   Both the treaty and the statute allowed the property to be conveyed and devised from one alien to another, and to be inherited by descent by alien heirs, without in any manner impairing or affecting the title to it.   This title, since the deed from Williamson has not passed into the hands of a citizen of this State or country, and while that shall continue to be its character, it will not be liable to escheat to the plaintiff by reason of the alienage of its owner. The disposition was right which the circuit made of this cause at the trial, and the judgment appealed from should therefore be affirmed, with costs.

WOODRUFF, J.   The argument of this appeal embraced many questions, which it is not, in my opinion, necessary to examine or decide.   No reason is assigned, and I think none exists, which should induce us to re-examine the case of *The Duke of Cumberland* v. *Graves* (3 Seld., 305), and the decision there must be deemed final on all questions of law involved in and disposed of in that case.

The questions which are prominently presented here, and which do not appear to have been contested in the former case are, *first;* whether the State of New York parted with its title to the lands in question, prior to the conveyance by Robert Morris to Charles Williamson in the former case, and in this case mentioned ?   *Second.* Was the State of New York reinstated in the title, by escheat or otherwise, prior to the conveyance to Sir William Pulteney, which, in the former case, was held valid and effectual to convey the title, and

operated by force of the acts of the legislature and the principles affirmed by the decision to make the subsequent conveyances also valid and effectual against the State, and so that no title by escheat afterward accrued?

The case referred to assumes that Robert Morris was, in 1792, seized in fee simple of the premises then in question, and then conveyed the same to Charles Williamson, by whom, in 1801, they were released to Sir William Pulteney, who was an alien. The court held that neither his alienage nor the alienage of his heirs-at-law, or of their subsequent devisees or grantees in succession, worked any escheat.

It is, therefore, in this case wholly unnecessary to examine the deeds or wills produced in evidence subsequent to the conveyance to Sir William Pulteney, or the authentication thereof, or inquire whether they, or the depositions produced to show the family history or those subsequent transfers; for there is no pretence that, except on the ground of alienage of Sir William Pulteney or his heirs or assigns, has the plaintiff any claim to a recovery, if Charles Williamson had title to the premises.

The plaintiff was bound to prove an escheat, and if the proofs did not establish that, it is wholly immaterial whether the proofs given by the defendant were properly received or not; the burden was upon the plaintiffs, and if the title was shown to be out of the plaintiffs when the conveyance to Sir William Pulteney was made, then this court have decided that no escheat was proved by the plaintiff. And it may, for the purposes of this appeal, be conceded that all the evidence put in by the defendant, to prove the subsequent history of the title, was erroneously received; and yet it will stand as a fact in the case, that at the time of the conveyance last mentioned, the plaintiffs had no title, and the plaintiff wholly failed to prove any subsequent escheat.

And on the other hand, if the proofs of the defendant were properly received, than they showed the state of the title which was before the court in *The Duke of Cumberland* v. *Graves,* and established negatively that no subsequent escheat

had happened.    This the defendants were not bound to do. The contrary the plaintiffs failed to do.    It is, therefore, wholly unnecessary to inquire whether the defendant's proofs were admissible or not; for, conceding them to be wholly inadmissible, the defendant was still entitled, so far as this point was involved, to the peremptory instruction in his favor which he had on the trial.

The questions then recur:    1st. Was it shown that the State had parted with its title, before the conveyance by Robert Morris to Charles Williamson?    And 2d. Was there proof of facts establishing an escheat prior to the conveyance to Sir William Pulteney?

In the first place, I am of opinion, that upon the true construction of the complaint herein, the plaintiffs must be held not only to admit, but to aver, that on the 20th day of February, in the year 1795, Robert Morris, then of the city of Philadelphia, in the commonwealth of Pennsylvania, was seized in fee and possessed of the premises in question.    These are the very terms of the plaintiffs' allegation.

What are termed in the complaint, the first, second, third and fourth causes of action, are in truth but a single cause of action, to wit., a statement of title to the premises in the plaintiffs, and a claim to recover the same; and their difference consists in the averment of different grounds upon which the recovery is claimed.    Under our former system of pleading, several causes of action were united by different counts in the same declaration, but in theory and in form, they were for the recovery of different subjects.    In this complaint the plaintiff claims to recover a specified parcel of land, and he avers the existence of four facts or combinations of fact, all consistent with each other, the truth of which he avers, and upon the truth of either of which, he claims to recover these premises.    However various or cumulative the grounds of claim, this constitutes but one cause of action.

The plaintiff therefore, in establishing his title to recover, may be taken to admit the truth of his own averments.    The defendant was not bound to prove any fact which the plaintiff averred.

If this be so, then the consideration of this appeal may begin with the admission of title out of the plaintiff, and in Robert Morris, on the 20th of February, 1795, and the only question will be: Did the plaintiffs prove a subsequent escheat prior to the conveyance to Sir William Pulteney already mentioned?

The plaintiffs averred that Morris, in 1795, by a conveyance executed by himself and wife, and then acknowledged and delivered, conveyed the premises to Charles Williamson, and that Williamson was then an alien.

But the plaintiffs proved neither fact, and the argument now urged on the appeal, is founded upon the evidence put in by the defendant, and even the proof of the conveyance itself to Williamson, is objected to as incompetent. Suppose we should be of that opinion. Where, then, is the evidence that Robert Morris ever conveyed the premises to an alien, or even that he has ever conveyed them at all. And in that view, what pretence can there be that the plaintiff established a right to recover?

Doubtless, however, the plaintiffs may avail themselves of the proofs put in by the defendant, and if they establish that Charles Williamson was then an alien, have the benefit thereof, though to make this of any avail to the plaintiffs, the fact of the conveyance by Morris to Williamson must also be derived from the defendant's proofs, which the plaintiffs on this appeal, are insisting were incompetent. But waiving this inconsistency, does it appear that Charles Williamson was then an alien?

A certified copy of a record, in the Supreme Court of the State of Pennsylvania, was produced in evidence, wherein a proceeding in that court, on the 9th of January, 1792, is entered, to the affect that Charles Williamson appeared in open court, made oath to support the Constitution of the United States, and was, on the said 9th day of January, 1792, admitted to be a citizen of the United States.

This is certified to be of record in the court, and to be certified from such records by the prothonotary of the said

Supreme Court, under the seal of that court, and is authenticated by the certificate of the chief justice, to the effect that the person so certifying was, and still is prothonotary of the said court, having custody of the records thereof, to whose acts as such, full faith and credit are and ought to be given, and that the said attestation is in due form.

The counsel for the defendants objected that this was not properly authenticated. Wherein it was defective was not pointed out, and I do not perceive any imperfection therein. He further objected, that there is no evidence that it is an original paper. It does not purport to be, nor is it essential that it should be. It is a proof of a record remaining in that court, in the form prescribed by the act of congress, making it evidence. And he further objected, that there is no evidence that it has been in the custody of any court or of any clerk thereof, or among the records thereof.

The authentication by the clerk (prothonotary) and by the chief justice, proves all those things.

The record being thus properly in evidence, it established the naturalization of Charles Williamson. It was a judicial act, and as such was conclusive, and it was properly a record of the court of its judicial action.

That it is thus conclusive, and requires no extraneous proof of any preliminaries, or of any other facts than the act of admission to citizenship, has been repeatedly adjudged. (See *Starke* v. *Chesapeake Ins. Co.*, 7 Cranch., 420; *Spratt* v. *Pratt*, 4 Pet., 406; *Ritchie* v. *Putnam*, 13 Wend., 524.)

If there were room for doubt, the observation of Justice NELSON, in 16 Wend., 625, that proceedings for the naturalization of aliens are to be construed liberally, and every intendment is in their favor, would require us to assume that the jurisdiction of the court over the subject being in no doubt, all prerequisites were satisfied.

I do not find that the objection, that there was no identification of the person naturalized, with the grantee, in Morris' deed, was made on the trial. Of course it cannot be first made here. But there was evidence, which was entirely satis-

factory. In addition to the presumption from identity of name, was the fact, that the transaction was in Philadelphia, where the grantor, Morris, resided, and the unqualified testimony that the signature to the oath of allegiance was the handwriting of such grantee.

Apart, then, from the treaty between Great Britain and the United States, which we are bound to recognize, Williamson was competent to take and hold lands as a naturalized citizen. The deed to him bears date in 1792; and if he was then a British subject, not naturalized, that treaty in very terms, confirmed his title, notwithstanding alienage.

If, however, the statement in the complaint that Robert Morris was seized on in 1795, is not to be taken as conclusive, or even *prima facie* true as against the plaintiffs, then it is material to inquire whether title out of the plaintiffs was proved.

The compact between the States of New York and Massachusetts, unless the objection that it exceeded the power of the legislature, divested the State of New York of the title to the premises in question. And, as already observed, unless the plaintiffs proved a subsequent escheat, the plaintiffs were not entitled to recover.

It is objected that such compact was not sufficiently proved. To this objection, I suggest:

*First.* That it forms a part of the political jurisdictional and territorial history of the State itself; and I am inclined strongly to the opinion that the acts of the legislature authorizing the negotiation, the acts of the legislature confirmatory, or in recognition thereof, and, as a consequence, the compact itself thus authorized and confirmed, are to be deemed within the judicial knowledge of the court. (Act of Nov. 12, 1784, Exhibit E; act of Jan. 25, 1787, Exhibit B; act of 1801, 1 Kent & Radcliff's Edition of the Laws of N. Y., p. 207, § 17; 1 Laws of 1813, p. 294, § 8.) In *Henthorn* v. *Doe*, ex dem. *Shepherd* (1 Blackf'd, 159), it was held that the claims of Virginia, to lands now forming part of the State of Indiana, in what was formerly called the northwest territory, the

cession thereof by Virginia in 1783 to the United States, and the statutes of Virginia in regard to the disposal of certain lands which were reserved in that cession, to be divided according to the laws of Virginia, are a part of the history and laws of Indiana, of which her courts will take judicial knowledge without specific proof. This is going even further than the present case calls for.

*Second.* Without resting on the suggestion last made, or considering the claim made by the respondent, that our statute (2 Rev. Stat., p. 404, §§ [59] 74), does not make an exemplification under the great seal of the State, inadmissible, but is confined to copies certified by the officers mentioned or referred to, under their official seal if any they have, the sufficient answer to the objection is, that if the mere authentication is defective, it furnishes *no present ground for reversal.*

Such a record, or authenticated copy of a record, may be produced on the argument of the appeal. The defect can be supplied, and the record itself admits of no contradiction.

The counsel for the respondent offered, on the argument, to produce such copy, authenticated, so as to obviate even the objection raised by the counsel.

To the suggestion that it should also appear that the State of Massachusetts ratified the compact, it must suffice to say, that if that is not to be presumed, the exemplified copy of the act of that State (Exhibit D), was evidence of their assumption of ownership of the land ceded to them, and this is sufficient.

It follows, that title out of the State of New York appears, and the plaintiffs have failed to prove an escheat. And therefore, whether the conveyances by Massachusetts, to Phelps and Gorham, or by them to Robert Morris, were duly proved or not, is wholly immaterial to this appeal. Let the evidence of those conveyances be struck from the case, and the result is the same. Error in receiving them, if any there was (which I do not here concede), could not affect the result.

And I have already said, that if the title be assumed to have been in Robert Morris, then no alienage was proved by the

plaintiffs, entitling them to recover, unless we overrule the case of *The Duke of Cumberland* v. *Graves*; and that, I think, was rightly decided.

I think the judgment should be affirmed.

All the judges concurring for affirmance, judgment affirmed.