TOWN OF BROOKHAVEN, as Substituted for New York State Environmental Facilities Corp., Petitioner, v JOHN DINOS et al., Respondents; ALBERT NUSBAUM et al., Appellants, and LUBMOS REALTY CORP., Respondent. (And Another Proceeding.)

Second Department, August 25, 1980

APPEARANCES OF COUNSEL

*Edward J. Ledogar (A. Kirke Bartley, Jr.,* on the brief), for appellants.

*Koeppel Sommer Lesnick & Martone, P. C. (Michael R. Martone* of counsel), for Lubmos Realty Corp., respondent.

## OPINION OF THE COURT

LAZER, J. P.

At issue in this proceeding under the Condemnation Law are conflicting claims of title to certain land acquired by the Town of Brookhaven for sanitary landfill purposes designated as Damage Parcels 88.2D (3 to 5 inclusive) (Part) and 88.2D (5 to 8 inclusive) (Part). The taking map named Lubmos Realty Corp. as the owner of the condemned land, but at a hearing conducted at Special Term to adjudicate the question of title, other claimants vigorously contested Lubmos' interest. Special Term decided in favor of Lubmos and rejected the claims of John J. and Elizabeth A. Baxter and Albert Nusbaum (Baxter-Nusbaum). This appeal is the consequence.

The property involved consists of certain portions of "long lot 29" on the Great Division of Lots of the Town of Brookhaven of 1733 (see Records of Town of Brookhaven, Book C, 1687-1789). The long lots in the Great Division—appropriately named because of their extreme length—have, over the years, been the subject of numerous plat filings. Two maps, filed more than seven decades ago, are the focus of the current

controversy. In 1916 the County of Suffolk obtained title to the land underlying both maps by tax lien foreclosures and decades later issued quitclaim deeds to the instant claimants or their predecessors. Lubmos derives its title through a deed dated October 6, 1954 from the county to Helen Goldstine, Lubmos' predecessor in title. In that deed the property conveyed is described as consisting of certain blocks and lots in section 7 of the Map of Broadway Central Realty Co. filed April 15, 1906, file 396. Baxter-Nusbaum did not receive their grants from the county until 1963, but their deeds describe the property conveyed by reference to blocks and lots on the map of Great South Bay Park filed April 28, 1897, file 483.

Lubmos' claim is simple: since section 7 of the Broadway Central map covers the portion of long lot 29 taken in the condemnation proceeding, once the county conveyed to Lubmos' predecessor, it divested itself of title leaving nothing which could be conveyed to Baxter-Nusbaum. Baxter-Nusbaum's contentions are multiple: (1) the Broadway Central map, upon which the Lubmos claim is based, does not cover long lot 29; (2) the reference to the Broadway Central map in the county's deed to Lubmos' predecessor comprises an insufficient description by which to convey title; and (3) the Great South Bay map does cover the condemned portion of long lot 29, rendering the county's conveyance by reference to that map sufficient to convey good title. Lubmos responds to these postulations by urging that the record demonstrates that the individual who filed the relevant Great South Bay map in 1897 had no title to long lot 29 and, therefore, the county acquired no title to that long lot when it foreclosed the Great South Bay map in 1916. As a consequence, title could not be conveyed by reference to that map. In any event, posits Lubmos, when valid and invalid title to long lot 29 merged in the county in 1916, the first deed out of the county conveyed good title.

█ Special Term resolved these antithetical contentions by determining that when the county foreclosed on both maps in 1916, title underlying the Broadway Central map was valid while that underlying Great South Bay was not; that the two titles, valid and invalid, merged when the county foreclosed the property under both descriptions; and that there was a total overlay between the two maps. The court thus adopted Lubmos' position that the first deed out of the county conveyed good title rendering the subsequent deeds nullities. We

believe that this analysis was erroneous and that reversal is required.

In rejecting the Baxter-Nusbaum claims, Special Term acknowledged that the Great South Bay map was filed prior to the Broadway Central map, but it found that William "Netland" (actually Netling), who filed the earlier map, did not possess title to long lot 29 which the plat purported to cover. To support this finding, Special Term relied on *Gaydos v Edwards* (139 NYS2d 154, affd *sub nom. Gaydos v Gygi,* 2 AD2d 681), in which Netling's title to an adjacent long lot covered by another section of the Great South Bay map was held invalid as against a different competing map. Our examination of the record reveals that when Netling filed the instant Great South Bay map he owned long lot 29.

■ Special Term's error in title analysis seems to stem from the fact that it overlooked or discounted a substantial portion of the evidence which supported Netling's title. Six deeds received in evidence at the trial established a chain of title which supports the view that Netling owned long lot 29 when he filed the Great South Bay map. Special Term's finding to the contrary apparently derived from the fact that several of the deeds in the chain of title were not filed until a year after Netling obtained and recorded his deed to the property. Yet, the title examiners who testified at the trial—including Lubmos' own witness—conceded that the tardily recorded deeds were valid and constituted a proper part of the Netling title chain. The record indicates that during the interim between the conveyance to Netling and the recording of the earlier instruments in his chain, no other conveyances of the property were recorded. In the absence of evidence to the contrary, the date a deed was signed is presumed to be the date of delivery *(Purdy v Coar,* 109 NY 448; *People v Snyder,* 41 NY 397; *Matter of Wright v State of New York,* 37 AD2d 874; 1A Warren's Weed, New York Real Property [4th ed], Deeds, § 2.03) and there is no presumption that it was not delivered until recorded *(Robinson v Wheeler,* 25 NY 252; *Ford v Gayle,* 155 App Div 675). Clearly, then, there is no reason why the questioned deeds should be disregarded as part of the chain, and we conclude that Netling had title when he filed the Great South Bay map.

■ The trial court's reliance on *Gaydos v Edwards (supra)* also was misplaced. While *Gaydos* did hold that one of the Great South Bay plats was a nullity, it did so with reference

to a plat which covered a different long lot. In *Gaydos (supra)*, the competing map was not a section of the Broadway Central plat; indeed, there is no proof that the Broadway Central map was filed by the owner of the property purportedly covered by it, nor is there any record of any deed conveying out Broadway Central lots from the date of the filing of the map to the county's acquisition of title. On this appeal, Lubmos makes no effort to support the original Broadway Central titles and relies instead on Special Term's merger rationale—that title, valid and invalid, merged when the county foreclosed both maps, and therefore the first deed out of Suffolk County vested good title in the grantee. The validity of this theory depends on the existence of a complete congruity or overlay of both maps and the adequacy of the descriptions used in the instruments of conveyance. Unless both maps covered the identical property, the merger would be incomplete and, to the extent of noncongruity, the title granted in the first deed would continue to be dependent on the validity of the title acquired when the county foreclosed the land described in the first deed. In determining that a complete overlay existed, Special Term relied on the testimony of two expert witnesses who testified for the town. Not only did their testimony fail to provide a basis for the determination of a complete overlay, but it compels a contrary conclusion.

The first of the experts, Paul Moore, was a surveyor who assisted in the preparation of the taking map. In Moore's opinion, based upon his study of several maps, an overlay did exist. He based the location of the Broadway Central map upon the lineup of its streets with established maps to the east and west. Nevertheless, when questioned concerning the maps which contributed to his belief, Moore admitted that when the Broadway Central map was laid upon the taking map, its streets did not line up with those of the map to the east while those of the Great South Bay Park map did. Moore was vague about the maps which lined up to the west and did not produce them.

When asked whether the property covered by the two competing maps was of the same length, Moore replied that a disparity existed. He admitted, however, that he had never calculated the lengths of the properties portrayed on the maps. He also agreed that if the parcel depicted on the Broadway Central map was of a lesser length than the land shown on the taking map, then the Broadway Central prop-

erty necessarily would be located somewhere to the east of that covered by the Great South Bay map. Finally, Moore conceded that the Broadway Central map did not show surrounding areas, monumentation, or abutting owners. Our own examination of that map reveals that it makes no reference to long lot 29, contains no compass points, compass courses, references to abutting land or abutting owners, and that there is no means by which the point at which the mapped property intersects with Horseblock Road and Northwest Road—its only identifiable boundaries—can be ascertained. The map simply contains a series of side-by-side rectangular blocks and streets obviously intended to portray blocks which actually run from some northerly direction to some southerly direction.

The other expert was George Kaigh, a surveyor, who supervised the preparation of the taking maps. Kaigh had been aware of the discrepancies between the lengths of the properties represented on the Broadway Central and Great South Bay maps, but he had neither made measurements he could relate to the court nor sent anyone out to measure the property purportedly covered by the maps. Shown the two competing maps, Kaigh agreed that there was a discrepancy between the lengths of the properties of the order of 800 to 1,000 feet. He then made the remarkable statement that in order to create what he viewed as a total overlay he had pushed the Broadway Central map northerly up to 1,000 feet so that its north boundary would abut Horseblock Road. Kaigh could give no particular reason for pushing the map northerly to Horseblock Road and said that he could just as easily have pushed it southerly to Northwest Road or created a gore.

Kaigh also agreed that the Great South Bay Park map and the condemnation map showed street widths which differed by no more than one to one and a-half feet and that the land shown was of the same width as that of long lot 29. However, in order to fit the Broadway Central map to the condemnation map, it was necessary to collapse the width of one Broadway Central street from 50 feet to 23 feet and expand another from 58 feet to 60 feet. Referring to Broadway Central, Kaigh declared that he did "not trust the scaling of this map" since it showed Horseblock Road to be one half of the correct width. Kaigh also noted that the Broadway Central map did not show on its face that it was located on any particular long lot.

Kaigh's testimony demonstrated not only the absence of a complete overlay, but also that those who prepared the taking map lacked knowledge of whether the land covered by it was the same as that covered by the Broadway Central map. Thus, complete congruity of the two maps was not established.

■ ■ Our decision that reversal is required rests on more than the absence of congruity, however. Whether a title description by reference to a map is adequate does not necessarily depend upon the validity of the title underlying the map. Thus, if the county obtained good title to long lot 29 in its foreclosure proceedings, it could convey that title by reference to a filed map which covered long lot 29, regardless of whether the person who filed the map had good title when he filed it. In this case, Suffolk County issued deeds to what is now alleged to be the same property to different sets of owners, one of whom—the claimant through the first deed—asserts its title is unassailable. Our analysis reveals that the description contained in Lubmos' deed and that of its predecessor is fatally defective. The critical element in description analysis is whether the deed description suffices for the purchaser of the property and all others interested to ascertain what property is involved (cf. *People ex rel. Staples v Sohmer*, 150 App Div 8) for the recording act itself and matters of constructive notice are implicated. A deed description is adequate so long as it allows the property to be located, even if an actual survey is required in order to do so *(Pope v Levy, 54 App Div 495)*. The question is not whether there are errors in the description, but whether the land can be identified with reasonable certainty notwithstanding the errors *(Goff v Shultis, 26 NY2d 240)* for otherwise there is no notice to subsequent purchasers searching the record. A title examiner whose testimony was adduced by Baxter-Nusbaum declared at the trial that a searcher engaged to examine title to the property by anyone who sought to purchase in long lot 29 would not have discovered the existence of the Broadway Central map.

On this record, we are constrained to conclude that the description by reference to the Broadway Central map was defective. In arriving at this determination, we are aware of the principle that a deed is void for lack of proper description only when it is so inaccurate that the identity of the property is wholly uncertain (6 NY Jur, Boundaries, § 94) and that this general rule is to be applied with the utmost liberality in

order to determine the intention of the parties *(Peck v Mallams,* 10 NY 509; *People v Call,* 129 Misc 862). The fact that the exact boundaries are not described in a deed does not make an instrument of conveyance from which the property can be identified void for uncertainty if it is possible by any rule of construction to ascertain what property is being conveyed *(Wendell v Jackson,* 8 Wend 183; see, also, *People ex rel. Myers v Storms,* 97 NY 364). Since a description is to be considered certain if it can be made certain *(Wendell v Jackson, supra),* parol evidence may be introduced to identify the property intended and its exact boundaries *(Mullen v Washburn,* 224 NY 413; *Cordua v Guggenheim,* 274 NY 51; *Orvis v Elmira Cortland & Northern R. R. Co.,* 172 NY 656; *Ambler v Cox,* 13 Hun 295; *Terry v Chandler,* 16 NY 354).

In determining the boundaries of described property, various descriptive elements such as monuments, courses and distances, adjacent lands, and area or quantity may be relied upon (1 Rasch, NY Real Property Law and Practice, § 1153). Property may also be described by reference to a map or plat on file in the register's office *(Johnson v Grenell,* 188 NY 407; see *Fries v Clearview Gardens Sixth Corp.,* 285 App Div 568). When such resort is made, the filed map must be taken as part of the deed and explanatory notes contained on the map became part of the description *(Brainin v New York, New Haven & Hartford R. R. Co.,* 136 App Div 393). Any combination of the mentioned elements or any other method which will clearly identify the property is sufficient *(Coleman v Manhattan Beach Improvement Co.,* 94 NY 229; *Evans v Beagell,* 276 App Div 883).

While the Broadway Central map shows individual blocks of property in the Town of Brookhaven, it makes no reference to the Great Division of Long Lots or to long lot 29. The only identifiable calls or boundaries on the map which could assist a searcher in locating the area of the property are Horseblock Road and Northwest Road. In the absence of compass directions, compass courses or references to adjacent property or owners, there is no means by which to ascertain at which point Broadway Central property touches Horseblock or Northwest Road and, therefore, there is no way to know where between these two roads the parcel is to be found. The absence of reference to the Great Division of Long Lots of 1733, to long lot 29, or to any long lot, adjacent owner or adjacent property eliminates the possibility of a reasonable

surmise that long lots 28 to 30 lie on either side of the Broadway Central map, and it has already been noted that the streets on that map do not line up with another map filed on the east. The best that may be said is that the map seems to depict an area 220 feet in width running between Horseblock and Northwest Roads in the Town of Brookhaven at a point where those roads are approximately 6,000 to 6,200 feet apart. According to Messrs. Moore and Kaigh, however, the distance between the two roads where the condemned property is located is about 7,000 feet apart, as shown on the taking map and the Great South Bay Park map. Since the distance between Horseblock Road and Northwest Road narrows as the roads proceed toward convergence east of long lot 29, the land covered by the Broadway Central map would seem to lie well to the east of the long lot. Unsure of where the Broadway property actually was, Moore and Kaigh succeeded in placing it between lots 28 and 30 on the Great Division by manipulating street widths and pushing it north almost a fifth of a mile to make it fit the taking map. They thereby established that they knew not where the actual property intended to be covered by Broadway Central abutted either of the two roads because—as Kaigh stated—the map could just as easily be pushed north as to the south or a large gore created in the property between the two roads.

We thus find that "[i]t is impossible, from the description, to ascertain * * * how far [the property] boundaries extend. It is impossible * * * to locate or identify the land thus described with any degree of certainty" *(Hunt v Dekin,* 187 Misc 649, 653-654, affd 273 App Div 800, affd 298 NY 575). A deed that is "so vague and indefinite that the property as there described is not capable of being identified as the land belonging to [respondent] * * * might as well have been a deed without any description whatever. The deed [is] void for uncertainty" *(Peterson v Martino,* 210 NY 412, 420 [CARDOZO, J.]). Regardless of the validity of either title when the original maps were filed, it is plain that the conveyance upon which Lubmos now depends is mortally deficient for lack of an adequate description (see *Peterson v Martino, supra; People ex rel. Buffalo Burial Park Assn. v Stilwell,* 190 NY 284). Indeed, it is so defective as to have provided no notice to a person seeking to purchase a portion of long lot 29 from the county that the property sought already had been conveyed out by it.

The Great South Bay Park description is not afflicted with

the same ailments. The map makes specific reference to lot 29 in the Great Division of Long Lots and it shows long lots 28 and 30 as well. The boundaries of the property conveyed thus can be located by reference to the Great Division. The map provides compass directions including the actual courses by degrees and minutes at which the property intersects Horseblock and Northwest Roads. It also shows the points at which portions of the mapped land not in issue here cross the main line and Montauk Division of the Long Island Railroad. It is apparent, then, that the deeds to Baxter-Nusbaum contain descriptions which are sufficient to identify the property (see *People ex rel. Staples v Sohmer*, 150 App Div 8, *supra; Cone v Lauer*, 131 App Div 193; *People v Patenaude*, 206 Misc 347, affd 286 App Div 140) and by which good title could be conveyed. The record therefore mandates a determination that when the relevant portions of long lot 29 were condemned, the Baxter-Nusbaum interests had title to them and that Lubmos Realty Corp. did not.

Accordingly, the order must be reversed insofar as appealed from, with costs, to provide that as to Damage Parcels 88.2D (3 to 5 inclusive) (Part) and 88.2D (5 to 8 inclusive) (Part) the respective owners are the appellant Albert Nusbaum and the appellants Elizabeth A. Baxter and John J. Baxter.

GIBBONS, GULOTTA and COHALAN, JJ., concur.

Order of the Supreme Court, Suffolk County, dated October 12, 1977, reversed insofar as appealed from, on the law and the facts, with costs, and the owners of Damage Parcels 88.2D (3 to 5 inclusive) (Part) and 88.2D (5 to 8 inclusive) (Part) are, respectively, appellant Nusbaum and appellants Baxter.