(166 App. Div. 528)

## MURRAY v. SMITH et al.

(Supreme Court, Appellate Division, Second Department. March 12, 1915.)

1. CORPORATIONS ☞461—CORPORATE POWERS—LOANING MONEY.
      A loan of surplus funds of a corporation, which it was not expedient to distribute as dividends, to a person who was not a stockholder, if ultra vires, was not otherwise illegal, as it was neither malum prohibitum nor malum in se.
      [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1814; Dec. Dig. ☞461.]

2. CORPORATIONS ☞186—STOCKHOLDERS—SALES BY CORPORATION TO STOCK-HOLDERS.
      A sale of building materials by a corporation dealing in such materials to a stockholder on credit was voidable, but not void, where there was no discrimination in prices, terms, or credits, and the extension of credit to him was not other than a fair risk of business.
      [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 695–701; Dec. Dig. ☞186.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. CORPORATIONS ⚖➪315 — DIRECTORS — BREACH OF DUTY — SECURING INDIVIDUAL DEBT.

It was no breach of the fiduciary obligation of a corporate director for him to take security for a personal debt due him from one who was also indebted to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1399, 1400; Dec. Dig. ⚖➪315.]

4. CORPORATIONS ⚖➪308—OFFICERS—SALARIES—INCREASE.

Where the three stockholders of a corporation were also its directors and officers, an increase in the salaries of two of them, as president and as secretary and treasurer, which was adopted by their votes against the vote of the third stockholder and director, was voidable, but not void.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ⚖➪308.]

5. CORPORATIONS ⚖➪308—OFFICERS—SALARIES—INCREASE.

Where all of the stockholders of a corporation were also directors, and were present when a resolution to increase the salaries of certain of the officers was adopted, it was immaterial that the increase was recorded as authorized at a special meeting of the stockholders, while the by-laws committed authority over salaries to directors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ⚖➪308.]

6. CORPORATIONS ⚖➪308—OFFICERS—SALARIES—AMOUNT.

Where the president of a corporation organized to take over the business of an insolvent firm was the principal owner of the corporation, and though he went rarely to its place of business he kept in constant touch with affairs through its secretary, treasurer, and bookkeeper, lent it his financial strength, guaranteed its commercial paper, advised as to its accounts and credits, and generally directed its conduct, as a result whereof it became prosperous, no wrong was done the corporation by an increase in his salary by a resolution for which he voted, after it had shown success and accumulated a considerable surplus, from $100 a year, as originally fixed, to $3,000 a year.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ⚖➪308.]

7. CORPORATIONS ⚖➪308—OFFICERS—SALARIES—AMOUNT.

Where the secretary and treasurer of a corporation dealing in lumber, coal, wood, and building materials took over the duties of the bookkeeper, attended at the office daily, and did his work, a salary of $1,200, allowed him by a resolution for which he voted, appeared fair and just.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ⚖➪308.]

8. CORPORATIONS ⚖➪312, 316—LIABILITY OF OFFICERS—"ACQUIESCENCE."

Where one of the three stockholders in a corporation, who were also its directors and officers, complaining of a loan of surplus funds to a person connected by marriage with the president, an increase in the salaries of the president and another officer, and sales of goods to one of the other stockholders on credit, was the vice president and manager of the corporation, devoted his entire time to its business, and had access to its books, into which he looked frequently, and which showed such loan, the loan was also specified on annual statements which he received and understood, and he knew of the increase of salaries, and was chargeable with knowledge that they were being paid, and knew of such sales, but never demurred, objected, or protested, or sought rectification or redress, except by voting against the increase of salaries, until after the death of the president and the other stockholder, several years after such transactions occurred, the transactions were ratified by his "acquiescence,"

which is quiescence under such circumstances that assent may be reasonably inferred from it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1376–1386, 1388–1392, 1401, 1402, 1404–1406, 1408, 1409, 1412–1414; Dec. Dig. ☜312, 316.

For other definitions, see Words and Phrases, First and Second Series, Acquiescence.]

9. CORPORATIONS ☜316—LOANS TO STOCKHOLDERS—RATIFICATION.

Under Stock Corporation Law (Consol. Laws, c. 59) § 29, providing that no loan of moneys shall be made by any stock corporation, except a moneyed corporation, or by any officer thereof, out of its funds, to any stockholder therein, a loan of the funds of a business corporation by the president to himself and another stockholder was a breach of duty on his part, and, being malum prohibitum, could not be ratified, as the ratification was as objectionable as the original offending.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1404–1406, 1408, 1409, 1412–1414; Dec. Dig. ☜316.]

10. LIMITATION OF ACTIONS ☜39—STOCKHOLDER'S ACTION AGAINST CORPORATION DIRECTOR.

The statute of limitations applicable to an action against a director and president of a corporation, to require him to restore corporate funds, loaned to himself and another stockholder in violation of Stock Corporation Law, § 29, was that of 10 years.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 172, 190-211; Dec. Dig. ☜39.]

11. LIMITATION OF ACTIONS ☜102—STOCKHOLDER'S ACTION AGAINST CORPORATION DIRECTOR.

Limitations did not run against a suit against a president and director of a corporation, to require him to restore corporate funds loaned by him to himself and another stockholder, until his death, where he remained a director until his death.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 494–505; Dec. Dig. ☜102.]

12. CORPORATIONS ☜319—DIRECTORS—ILLEGAL ACTS—LIABILITY.

In a stockholder's suit against the president and director of a corporation, to require the restoration of corporate funds illegally loaned, the stockholder had a right to insist that the illegal act be undone, though there was no proof of loss to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1415, 1416–1425; Dec. Dig. ☜319.]

Appeal from Special Term, Westchester County.

Action by James Murray against Edward S. Smith and others, as executors of Millard F. Smith, deceased, and another. From a judgment for defendants, plaintiff appeals. Modified and affirmed.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and RICH, JJ.

George W. Elkins, of New York City (James M. Hunt, of New York City, on the brief), for appellant.

Robert H. Wilson, of Brooklyn, for respondents.

JENKS, P. J. In 1897 a domestic corporation called Besson & Co. was organized to deal in lumber, coal, wood, and building materials. All of the capital stock, 250 shares, was issued to Smith, who gave 40 shares to Murray and 5 shares to Disosway, and there was no change in those holdings until Smith died. These three men

became, and remained throughout, the directors. Smith became president, Murray vice president and manager, and Disosway secretary and treasurer, and there was no change in these officers until Smith died. The corporation was in the full sense of the word a venture, because the firm of Besson & Co., its predecessor in the same field, had become insolvent and was virtually moribund in 1897, so that Smith, its creditor in a large sum, had taken over its business, assumed its liabilities, and had caused the organization of the corporation. Naturally enough, these three men seemed to deal with this close corporation as if it were a copartnership. Corporation procedure, observed somewhat for some time, fell into desuetude, and so from 1903 until 1912 there is no record of any meetings of directors or of stockholders, and there is proof that there was none. However, corporation books were kept, and at the end of each year a statement of its condition was furnished to each stockholder. The corporation was successful, for although no dividends were paid, yet at the death of Smith it had a surplus of more than $50,000 and there were no creditors. There seem to have been differences, but there is no proof of any dissensions while Smith and Disosway were alive. Disosway survived Smith but a few months. After the death of the former, Murray sought to sell his stock to Smith's representatives; but there was no sale. Now, when Smith and Disosway are dead, Murray brings this stockholder's representative action to compel the executors of Smith to pay into the treasury of the corporation moneys, on the theory that they were taken therefrom by a breach of the fiduciary obligations of Smith to the corporation. The corporation answered, and the defendant executors answered separately, denying some of the allegations of the complaint, and pleading acquiescence and ratification and the statute of limitations. At the close of the case the court thought that upon the proof the plaintiff was not entitled to any relief, and dismissed the plaintiff on the merits. The plaintiff accordingly appeals from the judgment.

I think that the judgment in its entirety cannot stand. Some of the transactions for which Smith may be held responsible are of such a character especially as mala prohibita, that the defenses of ratification or acquiescence, or in view of the circumstances the defense of the statute of limitations, are not available, while others of the transactions are open to the defense of ratification and acquiescence. The discussion is naturally divided by these two classes, and I shall consider first the transactions that are immune from this attack by this stockholder. The trial court made many findings, but it is unnecessary to reproduce them or to epitomize them now, inasmuch as I shall discuss the facts later on as they are supported by proof and therefore justly found by the court.

[1] The court found without exception that, prior to March 2, 1899, Ellen W. Besson, a connection by marriage of the said Smith, received about $6,600 moneys of the corporation, and that such moneys were loans. The loans were entered and carried on the books of the corporation, but there is no record of the manner, or of any corporate procedure, if there were any, whereby this money was lent to Mrs. Besson. The court found without exception that this money

had been taken from the treasury of the corporation, and the record, though vague, indicates that the time was in 1899. In the absence of all other proof which, were the fact otherwise, would have been forthcoming, for none knew the affairs and details of the corporation better than the plaintiff, as I shall presently show, we may infer that this money was taken from the surplus moneys of the corporation. It has been held that corporations "may temporarily lend their surplus funds on safe security, when it is inexpedient to distribute them among the shareholders." Morawetz on Private Corporations (2d Ed.) vol. 1, § 367; Cook on Corporations (6th Ed.) § 681; Garrison Canning Co. v. Stanley, 133 Iowa, 57–60, 110 N. W. 171, and cases cited. See, too, the intimation in McFarlan v. Triton Ins. Co., 4 Denio, 392–397.

There is no proof that it was expedient then or at any other time to distribute the surplus, which at the time of Smith's death was, as I have said, more than $50,000. There is no proof that there was any distribution at any time, or that dividends were ever paid, and there is no proof that the plaintiff or any other of the two stockholders suggested or asked for distribution or for dividends. Thus it appears that this policy of conserving the surplus was acquiesced in by all of them. Mrs. Besson paid interest upon the loan and reduced it. She owned the premises wherein the corporation carried on business, and the plaintiff admitted that she was financially responsible and abundantly able to pay this debt. There is a distinction between a temporary loan of the surplus funds of a corporation when not otherwise required, and the practice of lending the moneys of the corporation as if the corporation were a bank. And it is to be noted that section 29 of the Stock Corporation Law prohibits a loan of any moneys to *stockholders*. Even if such a loan was ultra vires the corporation, it was not otherwise illegal, and it was neither malum prohibitum nor malum in se. See Kent v. Quicksilver Mining Co., 78 N. Y. 159; Bissell v. M. S. & N. I. R. R. Co., 22 N. Y. 258, 269.

But whichever view we may take of the transaction, whether it was legal or ultra vires, I think that the plaintiff cannot prevail in this feature of the case for the reasons that I shall give only later on, inasmuch as they obtain as to other transactions. I attach little importance to the fact that the loan charged on the books to Mrs. Besson was changed afterwards, at the instance of Smith, to Mr. Besson, who apparently was not financially responsible. The plaintiff does not pretend to say that he was misled by the said change in the books. And Mrs. Besson, with the consent of the plaintiff, in lieu of testifying, but over objection as to competency, materiality, and relevancy, filed at trial her formal acknowledgment that the loan was made to her, that the reductions were made and the interest was paid by her, that the obligation was hers, with the promise to discharge it with interest.

[2, 3] The said Disosway bought building materials from the corporation. He was a resident of Dobbs Ferry, where this corporation carried on its business. He was reputed to be a man of wealth and of property, interested in several shops, and possessed of realty in the county of Westchester. He bought the materials for improvement of

his property. He was treated as was any other customer, and charged with the purchases on the books in an account which had amounted to $50,000. There is no proof of any discrimination in his favor in prices, terms, or credits. There is no indication that the extension of credit to him was other than a fair risk of business. At the time of Smith's death, Disosway had reduced his debt to less than $7,000. It was not shown that this was uncollectible. Such purchases were voidable, not void. Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

It is contended that Smith was answerable for such balance, not only on account of the relationship of Disosway with the corporation, but also because Disosway, being personally indebted to Smith, had assigned his life insurance policy of $5,000 to Smith as security, which was collected by Smith's executors, and because, in December, 1911, Disosway and his wife conveyed certain realty to Smith's executors on account of the said indebtedness to Smith. In the first transaction Smith himself had but taken security, and in the second transaction Smith, of course, had no part. I think that there was no breach of Smith's fiduciary obligation as a director, in that he secured security for a personal debt due from one who had an account with or was indebted to the corporation.

[4-7] At the inception of the corporation in 1897, the salaries of Smith as president, the plaintiff as vice president and manager, and of Disosway as secretary and treasurer, were made $100, $1,200, and $100 a year respectively. In 1903 Smith's salary was increased to $3,000, and Disosway's salary was increased to $1,200. The plaintiff voted against the resolution for such increases, and his contention is that he is entitled to have paid into the treasury of the corporation all moneys drawn by Smith and by Disosway which represent their increased salaries. That contention rests upon two grounds: First, that the resolution of such increases required the vote of Smith and of Disosway; and, second, that the salaries in the amount paid were excessive and a fraud upon the corporation. This specification as to the vote is correct, for Smith, the plaintiff, and Disosway constituted all of the stockholders and all of the directors of the corporation. But I think that this action was voidable, not void. Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152–162, 76 N. E. 1075, citing 10 Cyc. 790; Barr v. N. Y., L. E. & W. R. R. Co., 125 N. Y. at 274, 275, 26 N. E. 145; Godley v. Crandall & Godley Co., 212 N. Y. 121–132, 105 N. E. 818; Carr v. Kimball, 153 App. Div. at 839, 139 N. Y. Supp. 253.

The by-laws committed authority over salaries to the directors; the vote of increase is recorded as taken at a special meeting of stockholders, at which all of the stockholders were present, and consequently all of the directors, for they were one and the same. No point is made as to formalities, and I think it is unimportant, inasmuch as all of the directors actually voted on the resolution; in other words, it was not essential in this instance that the directors should hold a separate meeting at that time for that purpose. See Elyea v. Salt Mining Co., 169 N. Y. at 33, 61 N. E. 992; Cook on Corporations (6th Ed.) 606, and notes.

And I think that the trial court was right in finding that this salary was proper, and that the increase worked no wrong upon the corporation. The original salary of $100 to Smith is no criterion, for the corporation was formed to take over the business of an insolvent and apparently moribund firm. Smith was the principal owner of the corporation. The venture was practically his venture. He was a merchant in New York City, and engaged there as the president of a large corporation. He did not know whether the corporation would fail, where the firm had failed. He could not forecast how much of his time and attention would be required by this business. The value of his services as president is not to be measured by his attendance at the office or at the place of business. It is true that he went rarely to Dobbs Ferry, but he kept in constant touch with affairs through biweekly visits by Disosway, its secretary, treasurer, and bookkeeper. He lent to the corporation his financial strength, he guaranteed its commercial paper, he advised as to its accounts and credits and it may be inferred that he directed generally its conduct. And this fact stands out: That where the firm of Besson & Co., with the plaintiff as a partner, had failed, the corporation of Besson & Co., with Smith as its president and in control, succeeded. And when this increase of salary was made, the corporation had shown success and had accumulated a considerable surplus. Disosway was first its secretary and its treasurer, but later on took over the duties of the bookkeeper, who was discharged. He attended at the office daily and did his work. The salary of $1,200 seems fair and just.

[8] The question presented in this case is, not whether a stockholder had such a remedy, but whether this stockholder had it at the time he invoked it. The plaintiff, as we have seen, was a stockholder from the outset until the death of Smith, and for the same period he was vice president, director, and the manager. He devoted his entire time to the business at Dobbs Ferry. The books of the corporation were kept in its office at that place, were open to him, and were looked into frequently by him. They showed the loan to Mrs. Besson in specific terms. The plaintiff received at the close of each year statements of the corporate affairs in detail, that specified the loan, and he admits that he examined the statements and understood them, for he had been a bookkeeper. If we believe that he did not know of the loan to Mrs. Besson before or at the time it was made in 1899, that he did not learn of it from the books wherein it was entered, and our credulity is taxed when we remember his close association with this close corporation, we must believe that he knew of the loan when he received, read, examined, and understood the annual statements wherein it was set forth. In any event, the law will impute such knowledge to him. He knew of the increase of salaries in 1903, for he voted against the resolution, and he must have known, or was legally chargeable with knowledge, that these salaries were paid, inasmuch as these annual statements contained this information. He knew of the sales to Disosway, because the sales were executed under his direction as manager and were entered regularly upon the books. Now, there is not a bit of evidence that at any time he ever demurred, objected, or protested against any of these transactions, or sought rectification or redress,

save that he voted in 1903 against the increased salaries. It might well have been that protest or objection, or the seeking of relief within the corporation, would have been unavailing; but in any event he could have invoked the courts. How can he be heard to say that he was cowed by Smith, when he was independent enough to vote against Smith on the questions of the discharge of John Besson, the discharge of the bookkeeper, the substitution of Disosway for him, and the increases of the salary, including that made for Smith himself? The doctrine of acquiescence, as said in Lowndes v. Wicks, 69 Conn. at page 30, 36 Atl. 1079, is "well defined as quiescence under such circumstances that assent may be reasonably inferred from it." 2 Pomeroy's Eq. Jur., § 955 and note; Pollitz v. Wabash R. R. Co., 207 N. Y. 113–129, 100 N. E. 721; Kent v. Quicksilver Mining Co., supra. Upon the authorities cited, to which I may add Hoyt v. Latham, 143 U. S. 553, 12 Sup. Ct. 568, 36 L. Ed. 259, and Klein v. Independent Brewing Ass'n, 231 Ill. 594, 83 N. E. 434, I think that the plaintiff must be held to acquiescence as to these said transactions. See, too, Morawetz, supra, § 262, note 2.

[9-11] But, as I have said, there are other transactions as to which this judgment should not be affirmed. Between January 1, 1907, and the time of his death, Smith withdrew moneys from the corporation which at the latter period amounted, with interest, to $12,614.97, and prior to Smith's death Disosway had become indebted to the corporation for money received, which, according to the statement of January 1, 1911, amounted to $3,637.47. The court has found without exception that these moneys represent loans to these two persons. These moneys were entered and carried on the corporate books as such loans. These loans were made to these stockholders individually, and it must be presumed that they were for their own advantage. Therefore such use of the funds of the corporation was a breach of duty on the part of Smith (Pollitz v. Wabash R. R. Co., 207 N. Y. 113, 100 N. E. 721), and it was malum prohibitum (section 29, Stock Corporation Law). Such use, if malum prohibitum, was impossible of ratification, because ratification is as objectionable to that which is malum prohibitum as was the original offending. Pomeroy's Eq. Jur. (3d Ed.) § 964, note; Schwab v. Potter Co., 194 N. Y. 409–419, 87 N. E. 670; Continental Securities Co. v. Belmont, 206 N. Y. 7–18, 99 N. E. 138, 51 L. R. A. (N. S.) 112, Ann. Cas. 1914A, 777. Having in mind the decision and discussion in Pollitz's Case, supra, one may say that, if the defense of acquiescence rest upon the principle of ratification, then there could be no ratification of an act malum prohibitum, and if it rest upon the principle of estoppel, no new rights have arisen or could have arisen as to these borrowers since such loans were made. So far as laches is concerned, laches rests upon estoppel (Cook on Stockholders [2d Ed.] § 731, and authorities cited), and the cause of action is barred, not by laches, but by the statute of limitations (Pollitz v. Wabash R. R. Co., supra, 207 N. Y. at page 130, 100 N. E. 721). The statute of limitations applicable would be that of 10 years. Brinckerhoff v. Bostwick, 99 N. Y. 185, 1 N. E. 663. But as Smith remained a director of the corporation up to the time of his death in 1911 (section 28, General Corporation Law), I think that

the statute did not begin to run prior to that time (Zebley v. F. L. & T. Co., 139 N. Y. 461–469, 34 N. E. 1067; Ludington v. Thompson, 153 N. Y. 499, 47 N. E. 903; Nat. Bank of Commerce v. Wade [C. C.] 84 Fed. 10). Whether plaintiff acquiesced at the time these loans were made, or knew of them at the time they were made, we do not know. But it is clear enough that he knew of them, or at least is chargeable with legal knowledge thereof, for a number of years. But nevertheless I think that he is not barred from relief. Story in his Equity Jurisprudence (13th Ed., § 298) writes:

"In cases where the agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is particeps criminis is not in equity material. The reason is that the public interest requires that the relief should be given, and it is given to the public through the party."

[12] The learned counsel for the appellant calls to our attention that there is no loss to the corporation by the loans to Smith or to Ellen W. Besson, but I think that proof of loss to the corporation was not essential. The stockholder in such an action has the right to insist that the illegal act be undone. Byrne v. Schuyler Electric Mfg. Co., 65 Conn. 336, 31 Atl. 833, 28 L. R. A. 304; Schwab v. Potter Co., supra.

The judgment must be modified, so that the plaintiff recover for the corporation the amounts of the loans to Smith and to Disosway, with interest, and consequently the findings that are to the contrary are disapproved, and appropriate findings will be made in their stead, and when the judgment is thus modified it will be affirmed, without costs to either party. The parties must submit proposed findings to this court within 20 days. All concur.