Louis Schneider and Others, Plaintiffs, *v.* Greater M. & S. Circuit, Inc., and Others, Defendants.

Supreme Court, New York County, August 15, 1932.

*Nathan R. Margold,* for the plaintiffs.

*Nathan Burkan,* for Manhattan Playhouses, Inc., and Benjamin Sherman, defendants.

*L. & I. J. Joseph [Irving J. Joseph* of counsel], for the S. F. G. Trading Corporation, defendant.

*I. Gainsburg,* for remaining defendants.

COLLINS, J. The plaintiffs, as minority stockholders of the Greater M. & S. Circuit, Inc., a Delaware holding company, sue primarily to void as *ultra vires* contracts between the parent's direct and indirect New York subsidiaries and defendant Sherman. Though the attack aims at several agreements, since what affects one applies to all, the agreements will be treated as one.

The holding company represents the 1928 merger of two competing chains of motion picture theatres. It owns no substantial assets other than the stock of its subsidiaries. The assets of the subsidiaries consist, directly and indirectly, of about twenty motion picture theatres. Practically all of the stockholders in the two groups assented to the consolidation.

Though the plaintiffs are stockholders of the parent, the acts of which they complain are the acts of the subsidiaries. Indeed, application for leave to intervene by stockholders of the subsidiary, M. & S. Circuit, Inc., was denied by Mr. Justice FRANKENTHALER in May, 1932, who held that the action was one on behalf of the holding company. The parent and its direct and indirect subsidiaries have common officers and directors. There is unity of ownership, operation, control and management.

Almost immediately following consolidation serious dissension arose between those entrusted with the active management of the enterprise. The business suffered from incohesive and leaderless direction. Profits decreased. Balances became deficits. Mortgages were unsatisfied. Taxes became past due. Bills were unpaid and unpayable. Credit was so impaired that outstanding checks were held for insufficiency. Not only were funds unavailable to meet old liabilities and current expenses, but additional capital was needed to defray the cost of installing sound equipment necessitated by the projection of talking pictures. Minus this equipment the theatres would soon become obsolete and valueless. Insolvency threatened. The acquisition of additional capital became the imperative and imminent concern. Accordingly, those in charge essayed to seek escape or relief. Negotiations for an outright sale of the theatres terminated abortively. Thereupon the defendant Sherman entered upon the scene. He was an experienced operator of motion picture theatres, of good repute, and had financial connections. Negotiations with him ended abruptly. Then a loan was consummated with another. Finally, negotiations with Sher-

man were resumed. They culminated in a first draft of an agreement. Five other drafts preceded the ultimate basic agreement of September 17, 1929. The exhaustive discussions thereof extended over a long period and virtually all of the plaintiffs actively participated in or were aware of the negotiations.

The final executed agreement, now assailed by the plaintiffs as illegal, is no radical departure from the original draft. Substantially, they are identical. The first draft indicates a management arrangement, but Sherman, fearing uncertainty of tenure, insisted that the transaction assume the form of a lease.

The agreement contemplates the operation of the theatres by Sherman for a period of forty years from September 17, 1929, cessation to follow the happening of certain contingencies. The subsidiaries agree to furnish the use of the theatres, equipment, etc. The sum of $150,000, loaned to the subsidiaries by one Freedman, through Sherman's initiative, and secured by blanket mortgage on the subsidiaries' property, executed cotemporaneously with the delivery of the basic agreement is to be turned over to Sherman and used in connection with his operation of the theatres. Repayment of the $150,000 is to come from the subsidiaries' funds. The mortgage, though not yet matured, is now held by the defendant S. F. G. Trading Corporation, which, in this action, asks that it be ordered paid in the event the major transaction is nullified. On demand, Sherman is to receive from the subsidiaries such additional funds as he deems necessary for the maintenance and operation of the theatres, and provision is made concerning the production of a portion thereof. The financing is to be on the subsidiaries' credit and security. If necessary funds are not forthcoming, Sherman may terminate the arrangement or provide the funds himself, the subsidiaries' credit, however, securing same. In the event one of the theatres — Harlem Grand Theatre — be sold, $25,000 of the sale price is to be utilized in financing the operation of the other theatres. Bills receivable are collectible by Sherman and he is empowered to bring necessary suits in his own name. Sherman obligates himself " to give so much of his time and attention to the business of the theatres as he may deem necessary." He is permitted to continue the operation of three theatres then controlled by him. He is at liberty to be " interested or engaged in other enterprises, so long as they are not connected directly or indirectly with the operation, management or control " of theatrical projects. He is privileged to perform the obligations of the agreement through a corporation, the operating expenses of which are chargeable to the operating expenses of the theatres. Otherwise, the agreement is unassignable. Pursuant to this

privilege the defendant Manhattan Playhouse, Inc., came into being. Income and expenditures covering all of the theatres are treated as a unit, the subsidiaries receiving eighty per cent of the annual gross profits up to $200,000, and sixty per cent of the excess over $200,000, Sherman receiving the twenty per cent and forty per cent respectively. The agreement designates the relationship as landlord and tenant and the percentage payments by Sherman to the subsidiaries are called rent. The plaintiffs maintain that this is a misnomer, purposely designed to escape illegality. It is this characterization of Sherman as lessee, and its consequences, which supply the core of this litigation.

Advertence to the other features of the agreement is considered unnecessary. Admittedly, the agreement is novel and extensive. It confers large powers upon Sherman respecting the operation and direction of the theatres. Sherman contends that this is essential not only for his safety but that it makes for a successful operation of the venture. That the alliance proved advantageous is not controverted. Old obligations were liquidated. The theatres were improved. Debits were turned into balances. The arrangement was profitable to both parties. But prosperity begot discord. Disputes issued from the divergent interpretations of certain features of the agreement. Now, after the arrangement has been in operation for nearly three years, it is assailed as *ultra vires*.

But neither fraud nor bad faith is charged. Concealment is not claimed. There is no onset against Sherman's management. Rights of creditors are not involved. The element of moral turpitude is absent. There is no denial that the arrangement was approved at duly held meetings of the interested corporations. There was unanimous assent of the directors.

The plaintiffs ably insist that the agreement is *ultra vires* in that it divests directors of control over the business and embarks upon a relationship not sanctioned by the respective charters of the several subsidiaries. As observed, the plaintiffs challenge the designation of the relationship as that of landlord and tenant. They declare that Sherman is not obligated to pay anything as rent but that the theatres must bear all losses, as well as defray all operating expenses. They maintain that if the relationship be one of partnership it is illegal, since corporations may not lawfully become partners. If, the plaintiffs say, the union be that of management or trusteeship, the exclusive, irrevocable and unsupervised powers of control conferred upon Sherman compel invalidation.

Two preliminary objections are advanced by the defendants as precluding the maintenance of this suit: *First,* that the action seeks

to regulate the internal affairs of a foreign corporation, and *second*, that the foreign corporation is not qualified to do business here.

No validity attaches to these objections. The foreign corporation is not a party to the challenged agreement. The plaintiffs and individual defendants are residents of New York. The action pertains to the powers of domestic corporations. It concerns a business operated in New York, and affects property located here. (*Holmes* v. *Camp*, 180 App. Div: 409.) Regarding the second objection, there is no proof that the foreign corporation is doing business here. Bringing an action does not constitute doing business. Again, the foreign corporation is but a nominal party hereto.

The fundamental question here presented is the validity of the agreement. "An agreement capable of a construction which will make it valid will not be adjudged illegal." (*Manson* v. *Curtis*, 223 N. Y. 313, 320, 324.)

The court has deemed it unnecessary for a determination of the issue of illegality to catalogue the relation between the subsidiaries and Sherman. Search for a label often diverts from the quest for the truth. We are concerned with the facts and the law applicable thereto, regardless of nomenclature. The validity of the assailed transaction depends upon its true nature and effect. We are called upon to adjudge the substance and not the form. Equity will pierce the raiment and dissect the body. The right and wrong of an act transcend its classification. Characterization is neither an end nor an indispensible means to an end. Equity is not achieved by surface-scratching. It is not intended hereby to hold that the relationship itself is unimportant; merely that the decision hereof does not compel a classification of the relationship.

As I perceive it, the issue is whether the transaction is *per se* illegal. And this cannot be dealt with abstractly. The problem is not moot, but concrete. The question cannot be viewed apart from its setting. "We must look to the agreement as a whole, to the matters with which it deals, to the circumstances under which it was made and thereby determine the true intent and purpose of the parties." (*Manson* v. *Curtis, supra.*)

Generally, a void act is incurable; a voidable one may be cured by passivity or ratification or acquiescence. A void act is not always validated by the receipt of benefits thereby or thereunder, whilst such benefits might bar a successful assertion of the claim of invalidity. A void act usually denotes an inherent defect or vice, whilst an invalid one usually implies the absence of a formality. A void act usually refers to a fundamental public policy, whilst a voidable one is more often procedural. The former usually

relates to a public transgression, the latter to a private wrong. It is not every private wrong with which the State concerns itself. But where a public policy is affected the State is invested with its safeguarding and enforcement.

Of course, a corporation derives its life from the State, and the State, through the medium of the charter, prescribes the functions and limitations of that life. But the law strives to be reasonable and just. It will not suffer legal infinitesimals to outrage right. The object of law is more than an adherence to formalism. Inflexibility is not the end. Though stability and order require fixed legal principles, flexibility must be allowed to bring together the principle and the aim. The latter must be enlarged to meet the spirit. One of the capital virtues of equity is its elasticity.

I cannot adopt the distinction suggested by the plaintiffs that, though a corporation may sell its entire business, and thus divest itself of control thereof, it may not do what has been done here. (*Raymond* v. *Security Trust & Life Ins. Co.*, 111 App. Div. 191; *Jameson* v. *Hartford Fire Ins. Co.*, 14 id. 380, 385.) The directors here control the greater corporation's receipts; they have charge of the disposition of those funds. They may purchase, operate or lease other theatres, and, under certain contingencies, they may resume operation and direction of the theatres in question. Whatever else the law authorizes them to do, they are free to pursue. The several corporations continue to function.

Once it is conceded that a corporation may lawfully lease its plant and fix the rent upon a profit-sharing basis, I cannot perceive that the additional elements found here vitiate the transaction. The mere fact that the admeasurement of rent is involved or novel, or that the amount thereof graduates with the conditions, does not, as I see it, transmute the relationship from landlord and tenant to something else. (*Bartholomew* v. *Derby Rubber Co.*, 69 Conn. 521; 38 Atl. 45.)

" The executive administration of the affairs of the corporation " are not, as they were in *Manson* v. *Curtis* (*supra*), vested in Sherman " solely and exclusively, for the period named," nor are the directors here " passive or mechanical to the will and word of " Sherman. (*Manson* v. *Curtis, supra.*) Indeed, it would seem that the directors are insisting upon an interpretation of the agreement which Sherman maintains is antagonistic to him. Sherman came to the rescue of the subsidiaries when they faced destruction. Their present complaint, that the price paid for salvation was exorbitant, does not accord with the conceptions of equity.

Complete divestment of control *as directors*, and divestment of control over property occasioned by the leasing thereof, are entirely

different. In the latter case there is not that abdication of duty which the law condemns as violative of the trusteeship. In every instance where a corporation leases its business or plant or a portion of its property, the directors, *pro tanto*, surrender control. But the directors remain directors, and their general duties and powers continue unimpaired. (*Matter of Knaisch*, 203 App. Div. 725; *Hennessy* v. *Muhleman*, 40 id. 175; *Sewell* v. *East Cape May Beach Co.*, 50 N. J. Eq. 717.)

" Whether a corporation may become a technical partner or not, there is no doubt of its capacity to enter into commercial ventures within the general scope of its corporate powers, whereby the profits or losses of the enterprises are to be divided between the corporation and another person or corporation." (*Clinchfield Fuel Co.* v. *Henderson Iron Works Co.*, 254 Fed. 411, 415.)

I conclude that what was done here comes within the general scope of the corporate powers of these corporations.

Also weighing against the plaintiffs' right to relief is the significant fact that for nearly three years the agreement has been in the process of performance. The physical properties have been reconditioned. Sherman's services have been devoted to the business. His obligation to procure the $150,000 loan has been fulfilled. One entering into a forty-year business arrangement naturally alters his position. His previous business affairs are attuned to the new business situation. Too, the interests of those who loaned the $150,000, upon the strength of Sherman's connection with the theatres, are not to be ignored. Of course, if the transaction be absolutely void, consideration of the equities cannot be entered upon. But since I cannot view the agreement as being void, the equities demand recognition. (*Leinkauf* v. *Lombard*, 137 N. Y. 417; *Woodruff* v. *Erie Railway Co.*, 93 id. 609; *Mutual Life Insurance Co.* v. *Stephens*, 214 id. 488.) An *ultra vires* lease acted upon by the parties will not be disturbed. (*Bath Gas Light Co.* v. *Claffy*, 151 N. Y. 24, 35.) In *Vought* v. *Eastern Bldg. & Loan Assn.* (172 N. Y. 508), speaking of *ultra vires* agreements, it was said (at p. 518): " While they have no right to violate their charters, yet they have capacity to do so, and are bound by their acts where a repudiation of them would result in manifest wrong to innocent parties, and especially where the offender alleges its own wrong to avoid a just responsibility." Since this is a stockholder's action, the plaintiffs, deriving their rights through the corporation, they are, in effect, asserting the corporation's " wrong to avoid a just responsibility."

Viewing the setting, the equities here preponderate greatly in defendants' favor.

Another element appearing in the setting is the factor that virtually all of the plaintiffs have acquiesced in and ratified the agreement. Here, again, if the agreement were void acquiescence or ratification would be no bar. An individual cannot acquiesce in or ratify a public wrong. (*Schwab* v. *Potter Co.*, 194 N. Y. 409; *Murray* v. *Smith*, 166 App. Div. 528.) Despite, however, that the corporation derives its power from the State, it does not follow that in all instances where the corporation exceeds those powers, invalidity must be decreed. A majority of the plaintiffs were the moving spirits behind the agreement. Some of the plaintiffs have profited directly, and the others indirectly. Their conduct bears heavily upon their claim to relief. There was no secret about the agreement. It was openly arrived at. It was recorded. The plaintiffs' attempt at impeachment, following nearly three years of performance, during which changes have been wrought, is not favored. (*Sheldon Hat Blocking Co.* v. *Eickemeyer Hat, etc., Machine Co.*, 90 N. Y. 607; *Rabe* v. *Dunlap*, 51 N. J. Eq. 48; 25 Atl. 959; *Santos* v. *National Bank of Glens Falls*, 130 Misc. 348.)

Finally, militating further against the plaintiffs is their dubious right as stockholders of the parent to challenge an agreement between the subsidiaries and others. (*Brock* v. *Poor*, 216 N. Y. 387; *Sabre* v. *United Traction & Electric Co.*, 225 Fed. 601; *Martin* v. *Central Trust Co.*, 327 Ill. 622; *Martin* v. *Martin Co.*, 10 Del. Ch. 211.) Of course, the plaintiffs, through the holding company, are interested in the subsidiaries. And it may be that the affairs of the parent and its subsidiaries are so interwoven as to authorize the penetration of the legal fiction of separate entity. I prefer, however, to rest my conclusions upon more fundamental ground.

It follows that judgment must go for the defendants. Submit findings and judgment accordingly.

The court thanks counsel for their exceptionally skillful presentation of the facts and discussion of the law.