LOMA HOLDING CORPORATION, Plaintiff, *v.* CRIPPLE BUSH REALTY CORPORATION, Defendant.

Supreme Court, New York County, May 22, 1933.

*Kaye, McDavitt & Scholer* [*Herbert Rand* of counsel], for the plaintiff.

*Putney, Twombly & Hall* [*Frederic R. Sanborn* of counsel], for the defendant.

BLACK, J. This is an application by a corporation, the holder of a bond (and mortgage), for judgment on the pleadings under rule 112 of the Rules of Civil Practice.

The plaintiff corporation has sued for a balance of $24,117 upon an extension agreement dated December 31, 1930, wherein and whereby the defendant assumed payment of the mortgage debt, which extension expired December 31, 1931. There has been no further extension. The plaintiff has never demanded foreclosure, but in this action simply asks judgment upon the extension of the bond for the balance due. It merely becomes the duty of the court, therefore, to pass upon the complaint and the answer, and as there is no attack upon the complaint the only question to decide is whether the answer is sufficient. If it does not present legal defenses judgment for the plaintiff must inevitably follow. The answer denies none of the allegations of the complaint, but it sets up three separate and distinct defenses.

The first defense sets out that defendant was not the original maker of the bond which it afterward assumed; that at the time it assumed the payment of the bond and mortgage defendant had not been

theretofore bound or liable upon it; " that the ' true intent ' of all such agreements was that the mortgaged premises should be the primary security of the mortgagee, and that the defendant should stand in the position only of a surety for the payment of the deficiency, if any, between the fair   *   *   *· value of the mortgaged premises and   *   *   *   the mortgage debt."   Further, that there is " an abnormal world-wide and unprecedented cataclysm and disastrous depression"   *   *   *   so that there is stagnation in the real estate mortgage and lending markets and an absolute failure of   *   *   *   such markets; that a major emergency exists in economic affairs   *   *   *;   that because thereof no money can be obtained on bond and mortgage secured by real estate   *   *   *; that the guarantee companies find it impossible to obtain money for new loans secured by real estate even when said bonds and mortgages are guaranteed by said guaranteed companies; that defendant, a real estate company, has practically all its assets in equities upon which they cannot now obtain loans, and that to compel defendant to pay or raise a loan for the amount plaintiff sues for would unfairly deprive it not only of its equity of redemption in the property, but would harshly   *   *   *   destroy all defendant's equities in its properties and kill defendant company through such total destruction; that by reason thereof it is inequitable   *   *   *   and needlessly destructive of the values of defendant's properties   *   *   *   under existing conditions   *   *   *   without treating the mortgaged premises as the primary security for the satisfaction of its debt, and without first satisfying its debt to the extent of the   *   *   *   reasonable value of the premises, to compel the payment in cash of the entire amount now due, with interest, and that plaintiff should first proceed to satisfy its debt to the extent of the fair and reasonable value of the mortgaged premises; that plaintiff should be allowed to hold defendant liable for the deficiency thereafter ensuing, if any."   In the second separate defense defendant claims that the maintenance " of this action is contrary to the public policy of this state."

In the third defense defendant moves to dismiss plaintiff's complaint, to enjoin it " until such time as this court shall find the abnormal depression has ended and fair markets exist, and that if the court will not do this, that it be enjoined from proceeding further unless plaintiff be·required to credit defendant with the usual and fair value of the premises or a portion thereof, and that the bond and mortgage be canceled, satisfied and discharged of record, and that defendant be adjudged to own such portion of the premises as shall not be required to satisfy said indebtedness from any and all liens of plaintiff."   To put the defense briefly, the answer

demands from the judicial branch of the government of the State, in violation of every right of the plaintiff under the Constitutions of the United States and the State of New York, a moratorium for an indefinite period.

Upon the argument of this amazing proposition the reputable and able counsel for the defendant attempted to convince the court that it had power to do the things requested. And the sincerity of defendant's counsel was so convincing that the court has given longer time than usual to the consideration of the case. On the argument defendant's counsel disdained any of the threadbare defenses that are founded upon falsehood, and frankly contended that the situation of emergency clothed the court with powers not given to it by statute and without judicial authority until the very recent cases he quoted, one or two in this and other States. In the cases quoted by defendant's counsel, which he believes authorize a moratorium, *defendants complained that mortgages were being foreclosed in these depression times; in this case defendant complains that plaintiff seeks no foreclosure, but merely asks judgment on its bond* (permitting its mortgage to remain in abeyance for the present), with the evident intention of subjecting other properties of defendant. As both plaintiff and defendant in this case are corporations and the land is unimproved, the usual sentimental considerations are largely minimized. There is nothing in the papers before the court to show whether or not, when defendant made payments on the bond, real estate in like value was released to the mortgagor. Stripped of extenuating phraseology, the question the court has to decide is whether or not it has the discretion to set aside the Constitutions of the United States and the State and precedents approved by higher courts, and declare a moratorium of indefinite length, and if it has such power, whether it should be granted in this case. *First,* has this court the discretion to grant the moratorium requested?

It becomes necessary at the outset to go briefly into first principles, after which several considerations will be taken up in detail. " Lest we forget," a justice of the Supreme Court, pursuant to the provisions of chapter 574 of the Laws of 1917, when he assumes office by election of the people, takes an oath to this effect: " *I do solemnly swear that I will support the Constitution of the United States, and the Constitution of the State of New York, and that I will faithfully discharge the duties of the office of ———, according to the best of my ability.*" Similar oaths are taken by the justices of other States whose opinions defendant quotes, so that I assume that each of the conscientious judges whose opinions are quoted has the same profound respect for the Constitutions of the United States and of his State that this court has, and that each of them feels the same deep sense of respon-

sibility to the constituents who elected them that this court feels to the citizens whose vote elected him. The Fourteenth Amendment to the Constitution of the United States provides that no State shall " deprive any person of life, liberty, or property, without due process of law * * *." The sixth subdivision of article 1 of the Constitution of the State of New York repeats, among other rights guaranteed to citizens, the words of the Constitution of the United States. The vote of the people upon this was 221,528 for and 92,436 against.

Due process of law in judicial proceedings is law in its regular course of administration through courts of justice, and in accordance with fundamental principles of free government. (*Matter of Barnes*, 204 N. Y. 108, and cases cited in McKinney's Constitution of New York, 124.) " When a law annihilates the value of property and strips it of its attributes, by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretations, and certainly within the spirit of a constitutional provision intended expressly to shield private rights from the exercise of arbitrary power." (*Wynehamer* v. *People, etc.*, 13 N. Y. 378, and cases on page 113 of McKinney's Constitution of the State of New York.) The granting of the moratorium requested would clearly violate this provision of the Fourteenth Amendment to the Constitution of the United States, and the sixth subdivision of article 1 of the Constitution of this State. If the court is correct that such a moratorium is forbidden by both the United States and the State Constitutions, that prohibition would be controlling. But because the court shares the solicitude of defendant's counsel over the plight of some defendants in similar circumstances, it has gone at some length into a consideration of the cases defendant submits. The court wishes to emphasize the fact that in the study of these cases in the reverent spirit it feels the subject should be approached, and with the very highest respect for the opinions of those distinguished and conscientious jurists who wrote the opinions quoted, this court finds itself unable to agree with them on the question of moratoria. And it may be observed at the outset that these were cases where *mortgages were sought to be foreclosed*. They, therefore, vitally differ from this case, where defendant complains that plaintiff is *not* foreclosing its mortgage but seeks to make the value of his extension bond out of other properties owned by defendant. Because under section 1077 of the Civil Practice Act plaintiff must first secure judgment on his bond and have the execution returned unsatisfied before it can proceed under its mortgage. Even if the Constitution of the State of New York did authorize a moratorium, such authorization would be in the teeth of the quoted provision of the Constitution of the United States, and consequently would

be an unconstitutional or invalid provision of the State Constitution. The greatest weakness of the United States Articles of Confederation was that they made no provision for litigation further than maritime matters or contests between States. This omission had to be supplied by the Constitution of the United States which was adopted by the Constitutional Convention. The Constitution of the United States, adopted by State conventions of the people in each of the States, drew sharp demarcation lines between the functions of the three co-ordinate branches of the government — the executive, the legislative and the judicial. In the great majority of instances to date the executive has not sought to encroach upon the rights of the legislative or the judicial branch. When an executive has done so, quick efforts have been made to impeach him. The Legislatures, too, have a record of confining their activities largely to their own sphere. Owing to the power of judges it is even more important that they should stay in their own domain. The same division of powers between these three co-ordinate branches of our national government obtains in the State between the Governor, our State Legislature and our courts.

Too much praise cannot be given the President of the United States and the Governor of this State for the restraint they have uniformly exercised in these times of stress. Neither of them, to the court's knowledge, has ever invaded the realm of either the legislative or judicial branches of their respective governments, and even the emergency measures they have put into effect were either already provided for in a constitutional manner or were before promulgation approved by the Congress or the State Legislature. This because they must have believed that this was a nation, and a State, of laws, and not of men in office acting without authority of law. These executives have effectively and quickly functioned like the governors of a great steam engine working under the forces produced by fire and water, and the Congress and the Legislature have been jealous to guard the people against invasion of their constitutional rights. If there was one desideratum more than all others sought by the framers of our National Constitution and our State Constitution it was that neither of the three of the co-ordinate branches of our government should overlap nor impinge upon the rights of the other two. Each was supreme in its own department, and the combined strength of all three lay in the independence one of the other. The strength of the National or Federal Constitution is that it is broad and strong enough to embrace under its ægis the Constitutions of forty-eight different States. With the example then of the restraint of the Chief Executive of our nation at Washington, and with the example of the Chief Executive of our State at

Albany, how could any conscientious court for a moment think of usurping the power of the Legislature to declare, or the Governor to enforce, a lawfully declared moratorium upon the ground that an emergency exists, and how could any justice of this court restrain a corporation from enforcing through the courts the constitutional rights given it under an instrument in writing signed by another corporation and sealed with its seal? Some of the very men who through the injunctive power of our courts now seek moratoria for clients who are not fortunate enough to pay would be the first to denounce such usurpation of similar power if the courts sought to use it to oppress these same clients.

The judges have not the power to declare a moratorium — most of them do not seek it — and they are happy to confine their efforts to their own prescribed constitutional duties under the law. But it has been suggested that courts need not actually grant moratoria and call them such. And it has occurred to some advocates of moratoria at any cost that courts may delay their decision until good times come again. To this court the sleeping of causes is as unthinkable as the sleeping of judges, and it is as uncourageous to deny justice by delaying decision as it is unlawful to disregard constitutional rights. While I wholly differ with those courts in any State who in the exercise of their honest discretion declare moratoria without (in my humble judgment) any warrant of law therefor, they are more to be applauded than those courts that hang these important questions in the air until the emergency is over. They are much more to be commended for the humanity that wells up into their legal concepts than if they dodged the issues they were elected to decide, because indecision and procrastination are the " sleeping sickness " of lawsuits. And here it may be well to observe that judges all over the United States have been liberal in doing privately and publicly their share to help distress, each to the measure of his own ability. But when they come to decide between two corporations, they must no more sympathize with one or the other than must the juries whom they constantly instruct to " show no sympathy for nor bias against either side to a lawsuit."

Equity has been said to be equality; that is to say, the same measure of justice to each. How can any court say that defendant, who has borrowed money on property and spent it extravagantly or invested it unwisely, is entitled to any more sympathy than the man who has, after a lifetime of hardship and thrift, accumulated money which he lends at a reasonable rate of interest? The cases on defendant's brief, as already stated, do not sustain its contention. The reasons appear as follows: In *Morris* v. *Morris* (138 Misc. 682) the court merely relieved against a mistake of law. In the case

of *Schneider* v. *Greater M. & S. Circuit, Inc.* (144 Misc. 534), from which quotation is made by defendant, plaintiffs were refused equitable relief for the reasons given in the first headnote, as follows: " The plaintiffs, as minority stockholders of a foreign holding corporation, are not entitled to have declared void as *ultra vires* a contract between the parent corporation's direct and indirect New York subsidiaries and a third party, where it appears that the holding corporation represents a merger of two competing chains of motion picture theatres."

The defendant in support of its contention that courts will take judicial notice of what the world generally knows, cites *People* v. *Gitlow* (234 N. Y. 132). What the court took judicial cognizance of in that case was the death of President Garfield, an undeniable physical fact. The case of *People* v. *Snyder* (41 N. Y. 397) merely held that the court took judicial cognizance of the history of the entire western boundary of the State. The next case cited (*Merrihew* v. *Parrott*, 168 App. Div. 704) was likewise a case of fraud. The case of *Millsnaugh* v. *Cassedy* (191 App. Div. 221) was a case where equity relieved against mutual mistake in drawing papers. The case of *Vanderbilt* v. *Mitchell* (72 N. J. Eq. 910) is then cited. The case of *State* v. *Anderson* (6 Tenn. Civ. App. 1) is inapplicable because that was where defendant was practicing without a license and the attorney sought to restrain him. The case of *Harrigan* v. *Gilchrist* (121 Wis. 127), cited by defendant to support the contention that " equity should respond to the social needs of the people " and " to restrain," is inapplicable, because in that case decrees were vacated because they had been secured by collusion and fraud. The case of *Rice* v. *Van Vranken* (132 Misc. 82) was where plaintiff sought to maintain an action to restrain defendant from violating a zoning ordinance. The·court fails to see its applicability.

The court cannot see any applicability in the case of *People* v. *Tweed* (5 Hun, 382). That was a case which held that " a person may be arrested in a second action for the same cause by the same plaintiff, if the plaintiff has been *non prossed* in the former action, or such action has been discontinued and the second arrest is not vexatious." In urging that equity must " step forward, create a new precedent and erect a new equitable shield " defendant invokes *Susquehanna Steamship Co.* v. *Andersen & Co.* (239 N. Y. 285), but that case is not applicable because it was a case where plaintiff alleged a mistake. The case next cited (*Vadney* v. *United Traction Co.*, 193 App. Div. 329) merely held that the court will take judicial notice that a sleigh is not a vehicle that runs on wheels. Defendant's case of *Matter of Clark* (257 N. Y. 132), invoked as authority for

judicial notice of hard times, merely held that a trustee was not negligent in selling stocks, and the cases of *Matter of Parsons* (143 Misc. 368) and *Matter of Kent* (146 id. 155) are to the same effect. The case of *Fisher* v. *Hersey* (78 N. Y. 387), cited by defendant is inapplicable because there there was a resale ordered on account of fraud, and the quotation must have referred to that state of facts. The court merely held that a resale may be had where fraud is alleged, although the fraud may not be clearly established.

The case cited in defendant's memorandum at page 16 of *Wallworth* v. *Holt* (4 Myl. & C. 619) has no application here. It was an action for an accounting. The " general rule " quoted by defendant from 21 Corpus Juris, page 35, is not quite complete. The next sentence following qualifies the sentence quoted as follows: " But while this is true, yet the facts of the case must come within some head of equity jurisprudence." In support of the proposition that the absence of precedent is never an objection defendant cites *Drucklieb* v. *Harris, Inc.* (155 App. Div. 83), but that case was upon a different state of facts because plaintiff had been guilty of actual fraud in conspiring to falsify books said to show a low valuation of stock. Neither can the court see any applicability in the *Earl of Clanrickard's Case* (Hobart's Reports, p. 273), because it involved none of the points being considered in this case. In the case of *Suring State Bank* v. *Giese* (N. Y. L. J. Mar. 7, 1933; 246 N. W. 556) the court held that notwithstanding the fact that the court below in the original judgment ordered a judgment for deficiency, the court would only *confirm the sale* upon the express condition that plaintiff be not *entitled to a deficiency judgment.* And the court said that the " potential value of real estate may be legitimately taken into account." After saying that it was not error to deny the deficiency judgment (which the court had already granted) the court went on to say that " the plaintiff should have been given the option to accept or reject the condition." It would seem by his appealing that the plaintiff had not cared to avail himself of the " option " as to whether his rights should be enforced or not. But at any rate the decision of the learned court added another arc to the legal circle around which plaintiff is still running in the effort to get what the defendant agreed he should have and what the court had first said he was entitled to. This court respectfully disagrees with the doctrine of this Wisconsin case, the reasons for it, with the delays that the enforcement of it entail, and with the proposition that the potential value of property (at what future time this potential value may or will arise or what it may or will be the court does not say) may be taken into the account. With all deference this court does not believe that some of the cases quoted by the learned justice in that case justify his conclusions.

The case of *Meehan* v. *Blodgett* (86 Wis. 511), cited by that learned court, expressly held that mere inadequacy of consideration is not a sufficient ground for setting aside a foreclosure sale. In the case cited by the learned court of *Griswold* v. *Barden* (146 Wis. 35) the court said: " But if a failure to obtain a fair and adequate price was due in whole or in part to mistake, misapprehension or inadvertence * * * even though there was no fraud, the court may * * * refuse to confirm the sale." In other words, that mere inadequacy of price is not enough by itself to cause the court to refuse to confirm the sale. This court is unable to see the application of the case of *Northern Pacific Ry.* v. *Boyd* (228 U. S. 482). What the court held there was that even in the absence of fraud, any device, whether by private contract or under judicial sale, whereby certain stockholders are preferred, is invalid. This court sincerely regrets that it cannot agree with the reasoning of the learned court in this department in its erudite opinion in *Bank of Manhattan Trust Co.* v. *Ellda Corp.* (147 Misc. 374). Let us examine some of the cases that are in point.

In the case of *Anderson* v. *White* (Jan. 1894, 2 Dist. Col. App. Cas. 408) there is authority for the proposition that " when the terms of a deed of trust have been followed by the trustees in making sale thereunder, and no violation of duty on their part can be shown, the hardship of the condition of the grantor, *hard times, scarcity of money, unpropitious time of year for selling, or the fact that the property would probably sell for much more at a later period, will not afford grounds in equity for setting aside such a sale. * * *  The charge in a bill to set aside such a sale, that the excessive cold prevented the attendance of bidders, will not in the absence of the allegation of a specific fact from which it can be determined whether or not possible bidders were reasonably prevented from attending the sale, justify equitable interference with such sale, when the bill also shows that as a matter of fact there were bidders present." (Headnote.) In his opinion Mr. Justice Shepard said: " Courts of equity are charged with no power of relief against the hardships and misfortunes which sometimes attend upon the prompt and rigid enforcement of debts and obligations which have matured in accordance with contracts whose validity is conceded." In the case of *Muller's Administrator* v. *Stone* (May, 1888, 84 Va. 834; 6 S. E. 223) it is held that " a trustee is not entitled to enjoin a sale under a prior trust deed, providing for sale in accordance with Code of Virginia, 1873, chapter 113, section 6, upon the ground that the sale will be greatly inequitable ' *inasmuch as it is notorious that real estate in this section brings but a proportion of its value on deferred payments, and if sold for cash, as proposed, * * * at a time of great financial*

*depression,* \* \* \* *must be disposed of at an unnecessary sacrifice.'* "

In the case of *Lipscomb* v. *New York Life Ins. Co.* (138 Mo. 17; 39 S. W. 465) it was held that " the fact that property sold under a trust deed for less *than its value in former years, owing to a general depreciation in values, the price realized being, however, its fair market value at the time the sale was made, does not afford a ground for equitable jurisdiction to set aside the sale.*" In his opinion Mr. Justice BRACE said: " The legal title to the premises passed to the grantee, and unless misfortune alone can be made a substantial and independent source of equity jurisdiction, to be exercised in behalf of one who does not even offer to do equity (either because he is unable or unwilling to do it) the plaintiffs have not a foot to stand upon in a court of equity. However strongly our sympathies may be enlisted for the unfortunate victim of hard times, they cannot furnish a basis for equity jurisdiction; and such courts cannot and ought not to be made the instruments of speculation in the future values of property, even for the benefit of the unfortunate. To gain even the ear of a court of equity, the plaintiff ought to have manifested a willingness to do equity, by offering to redeem. But this they are not willing to do. They simply want the court to try the hazard of the market again. The sale, certainly, is not void; and if voidable for any reason, the plaintiffs have not placed themselves in a position to have it avoided. So we need not pursue the investigation further. The judgment is affirmed. All concur."

In *Bolich* v. *Prudential Ins. Co. of America* (164 S. E. 335, Sup. Ct. N. C., June, 1932) it is held that " Depression or unprecedented scarcity of money for ordinary transactions or enforced stagnation of real estate market did not warrant court's restraining sale under trust deed." The court held in *Floore* v. *Morgan* (175 S. W. 737, Ct. Civ. App. Texas, Feb. 1915) that " An unpropitious market is not sufficient ground for enjoining a foreclosure sale \* \* \*. In a suit to enjoin a foreclosure sale, the mere conclusion of a pleader that the property would not bring its full value cannot be considered in absence of facts alleged reasonably tending to support it." In the case of *Cameron-Hawn Realty Co.* v. *City of Albany* (207 N. Y. 377, Feb. 1913) Judge COLLIN said (p. 381): " Difficulty or improbability of accomplishing the stipulated undertaking will not avail the obligor. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse non-performance. The courts will not consider the hardship or the expense or the loss to the one party or the meagreness or the uselessness of the result to the other. They will neither make nor modify contracts nor dispense with their performance. When a party by his own contract creates a duty or charge upon himself he is bound to a possible

performance of it, because he promised it and did not shield himself by proper conditions or qualifications."

*Second,* even if this court is vested with discretion to declare a moratorium, should that discretion be exercised in this case? What is the effect of one moratorium granted in a case like this? If granted and affirmed by the higher courts it will be followed by so many thousands that it will block the calendars of the courts and produce chaos in the community. Every moratorium is a temporary repudiation. Every bank, or other lender, will be unable to collect interest or the principal of any debt and there will consequently be enormous reduction of the funds available to pay employees, servants or any other creditors. Being unpaid, their purchasing power will be reduced in like manner and the vicious circle will persist. If a court can say that A cannot collect from B, the same court must say that B shall not collect from C and that C shall not collect from D. We have had a taste of a temporary bank moratorium that our government checked in about ten days. We are rapidly rising from the slough of despond and our efforts are being seconded abroad. How could the country be better off if there was a permanent moratorium on all debts so that no man could collect what is due him? And what court can say who would take advantage of the court's sympathy for the man it considers less fortunate than his opponent? Will the applicant for moratoria be confined entirely to the deserving, or will they be taken advantage of by some of the same designing men who swamp the bankruptcy courts with their continued and continuous failures? And what will become of the money intrusted to banks and institutions? Will the sane head of any honest institution lend his own or the money of others with the possibility of a moratorium staring him in the face every time he seeks to enforce a legal debt? It is the universal experience of mankind that interest rates rise and that money becomes scarce when collateral is not collateral and because it cannot be enforced, and when lenders have not the same rights that borrowers have. There are not enough courts to decree the moratoria that would follow a moratorium affirmed by the higher courts, and if the higher courts should sanction such a doctrine, credit would ossify and the confidence that is at last returning would freeze as hard as ice. After all, ours is the supreme expression of man's highest aspiration for a stable constitutional form of government, and its establishment marks the evolution of hundreds of years of patriotic struggle. *It must not be destroyed, for many of us still think that the Constitution of our fathers is a very holy thing.*

As the defenses are insufficient in law, the motion by plaintiff to strike out the defenses and for judgment on the pleadings is granted.